CLERK, U.S. DISTRICT COURT

JUL 26 2012

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

MONICA HUJAZI,                )        NO. CV 11-9219-ODW(E)
                             )
            Petitioner,       )
                             )
        v.                    )        ORDER ACCEPTING FINDINGS,
                             )
SUPERIOR COURT OF CALIFORNIA, )        CONCLUSIONS AND RECOMMENDATIONS OF
COUNTY OF LOS ANGELES,        )
                             )        UNITED STATES MAGISTRATE JUDGE
            Respondent.       )
                             )
_____)

    Pursuant to 28 U.S.C. section 636, the Court has reviewed the Petition, all of the records herein and the attached Report and Recommendation of United States Magistrate Judge.  The Court accepts and adopts the Magistrate Judge's Report and Recommendation.

    IT IS ORDERED that Judgment be entered denying and dismissing the Petition with prejudice.

///
///
///
///

1    IT IS FURTHER ORDERED that the Clerk serve copies of this Order,

2  the Magistrate Judge's Report and Recommendation and the Judgment

3  herein on counsel for Petitioner and counsel for Respondent.

4

5    LET JUDGMENT BE ENTERED ACCORDINGLY.

6

7    DATED: _____ July 24 _____, 2012.

8

9

10   _____

11            OTIS D. WRIGHT II
         UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

11  MONICA HUJAZI,                        )     NO. CV 11-9219-ODW(E)
                                          )
12               Petitioner,              )
                                          )
13        v.                              )     REPORT AND RECOMMENDATION OF
                                          )
14  SUPERIOR COURT OF CALIFORNIA,         )     UNITED STATES MAGISTRATE JUDGE
    COUNTY OF LOS ANGELES,                )
15                                        )
                                          )
16               Respondent.              )
                                          )
17  _____)

18       This Report and Recommendation is submitted to the Honorable

19  Otis D. Wright II, United States District Judge, pursuant to 28 U.S.C.

20  section 636 and General Order 05-07 of the United States District

21  Court for the Central District of California.

22

23                              PROCEEDINGS

24

25       Petitioner filed a "Petition for Writ of Habeas Corpus By a

26  Person in State Custody" on November 7, 2011.  The Petition asserts

27  that the trial court denied Petitioner the right to put on a defense

28  by allegedly finding that the subject offenses are "strict liability"

1 │ offenses under California law (Ground One).[1]  On January 31, 2012,

2 │ Respondent filed an Answer and a Memorandum of Points and Authorities

3 │ in support thereof.  Petitioner filed a Reply on May 16, 2012.

4 │ Respondent lodged certain exhibits ("Respondent's Lodgments") on

5 │ June 1, 2012.

6 │

7 │                          **BACKGROUND**

8 │

9 │     On March 26, 2009, a Los Angeles County Superior Court jury found

10 │ Petitioner guilty of 24 counts of violating Los Angeles Municipal and

11 │ County Building, Fire, and Health and Safety Codes regarding her

12 │ maintenance of the apartment building located at 207 N. Oxford Avenue

13 │ (Reporter's Transcript ["R.T."], pp. 382-91; Clerk's Transcript

14 │ ["C.T."], pp. 96-108).[2]  The trial court ordered Petitioner to serve

15 │ ─────────────────────

16 │     [1]    Petitioner filed an earlier petition attacking a
   │ different conviction that raised a claim similar to the claim
17 │ raised herein.  See Hujazi v. Superior Court, Case No. CV 11-
   │ 1555-ODW(E).  The Magistrate Judge is filing a Report and
18 │ Recommendation in the earlier filed case concurrently herewith.

19 │
   │     Petitioner also filed an earlier petition attacking the same
20 │ conviction, raising the claim raised herein, plus a claim of
   │ ineffective assistance of counsel.  See Hujazi v. Superior Court,
21 │ Case No. CV 11-2369-ODW(E).  The Court dismissed that petition
   │ without prejudice for failure to exhaust available state
22 │ remedies.  See id. (Docket Entry Nos. 35-38).

23 │     [2]    The counts charged: (1) failure to maintain fire
   │ protection equipment, fire assembly, fire protective signaling
24 │ system, and smoke detector, and maintaining the same in a state
   │ of disrepair; (2) failure to maintain exit signs and smoke
25 │ detectors; (3) failure to maintain sufficient light to enable
   │ persons to find, distinguish, and use exits; (4) maintaining fire
26 │ assembly doors, activated by smoke detectors and self-closing
   │ devices, that were wedged, blocked, obstructed, and otherwise
27 │ impaired from proper operation, and failing to keep said doors in
28 │                                          (continued...)

1    90 days in county jail, but suspended imposition of Petitioner's

2    sentence and placed Petitioner on 36 months of summary probation with

3    a condition that Petitioner complete 400 hours of community service by

4    a date certain and pay fines (R.T. 457-58; C.T. 116-33).

5

6       On January 18, 2011, the Los Angeles County Superior Court

7    Appellate Division affirmed the judgment in a reasoned decision

8    (Respondent's Lodgments 7, 10). On February 7, 2011, the Appellate

9

10      [2](...continued)
     a closed position and equipped with approved self-closing
11    devices; (5) failure to maintain, test, repair, and/or provide
     certifications for fire alarm systems, wet and dry standpipes,
12    fire escapes, and/or fire doors; (6) terminating the water heater
     ventilation pipe at an improper location; (7) altering,
13    reconstructing, and repairing electrical wiring without a permit;
     (8) failing to maintain the physical elements of the building by
14    cleaning, painting, staining, or refinishing; (9) failing to
     provide each apartment door opening into an interior corridor
15    with an approved self-closing or automatic device; (10) failing
     to maintain exit signs internally and externally illuminated;
16    (11) failing to maintain in clean and sanitary condition and in
     good repair the (a) walls and ceilings of every room, structure,
17    and portion thereof; (b) electrical service, lines, switches,
     outlets, fixtures and fixture coverings and supports; (c) doors,
18    windows, window screens, cabinets, and frames; (d) floor and
     floor coverings; (e) plumbing fixtures, shower enclosures, waste
19    water drain lines, water supply lines, counters, drainboards, and
     adjoining wall and floor areas to protect against water damage;
20    (12) failing to provide exit doors openable from the inside
     without the use of a key; (13) adding, altering, changing,
21    constructing, installing, locating, maintaining, moving,
     occupying, relocating, removing, renovating, repairing,
22    replacing, and using a plumbing system, water connected
     dispenser, fire sprinkler system, rainwater piping, standpipe,
23    subsurface draining pipe, swimming pool piping, reclaimed water
     piping, and underground fire protection piping system except as
24    provided by Los Angeles Municipal Code; and (14) failing to make
     watertight plumbing fixtures in contact with walls and/or floors.
25    See C.T. 1-22 (Misdemeanor Complaint); R.T. 382-91 (verdicts);
     see also Respondent's Lodgment 7, pp. 1-2 n.1 (summarizing
26    counts).

27

28

1  Division summarily denied Petitioner's "Petition for Rehearing and

2  Transfer to the Court of Appeal" (Respondent's Lodgments 8, 9).

3

4      Petitioner filed a "Petition for Writ of Mandate/Prohibition

5  After Transfer from Appellate Division" in the California Court of

6  Appeal, which the Court of Appeal denied summarily on February 24,

7  2011 (Respondent's Lodgments 11-12 (citing Cal. R. Ct. 8.1005(a)).[3]

8  On September 14, 2011, Petitioner lodged with the Court in a prior

9  case (Case No. CV 11-2369-ODW(E), Docket No. 33) a "Petition for Writ

10 of Mandate to Exhaust State Remedies" that Petitioner submitted to the

11 California Supreme Court purporting to raise Ground One herein.  On

12 November 7, 2011, Petitioner lodged with the Court the California

13 Supreme Court's October 19, 2011 summary denial of that petition.

14

15                    **SUMMARY OF TRIAL EVIDENCE**

16

17     The following factual summary is taken from the opinion of the

18 Los Angeles County Superior Court Appellate Division in People v.

19 Hujazi (Respondent's Lodgment 7).  See Galvan v. Alaska Dep't of

20 Corrections, 397 F.3d 1198, 1199 & n.1 (9th Cir. 2005) (taking factual

21 summary from Court of Appeal opinion).

22

23  _____

24        [3]     Rule 8.1005(a) provides in relevant part:

25        The appellate division may certify a case for transfer
          to the Court of Appeal on its own motion or on a
26        party's application if it determines that transfer is
          necessary to secure uniformity of decision or to settle
27        an important question of law.

28 See Cal. R. Ct. 8.1005(a)(1).

1    [Petitioner] owned a building located at 207 North

2    Oxford in the County of Los Angeles.  The building contained

3    approximately 32 apartments.  The building was inspected on

4    different occasions by Lee Bruce of [the] Los Angeles

5    Housing Department and Luis Jaramillo of the Los Angeles

6    Fire Department.

7

8    Mr. Bruce inspected the building on October 31, 2009.

9    He took photographs of the building and those photographs

10    formed the basis for the charges in counts 24 through 36.

11    The photographs were admitted into evidence and depicted the

12    following building code violations: (1) a missing

13    temperature and pressure release valve extension on a water

14    heater; (2) an unapproved use of an electrical conduit;

15    (3) a broken rain gutter; (4) a defective emergency egress

16    door; (5) an exit sign that was not illuminated; (6) a

17    defective wall with "knocked out" portions of plaster;

18    (7) two defective ground fault interruptor outlets;

19    (8) three defective cabinets; (9) a hole in the wall located

20    under a sink; (10) defective grouting in a kitchen; (11) a

21    defective bathroom window; (12) an improper "double-key

22    deadbolt lock" on an entry door; (13) the absence of

23    ventilation in a kitchen; (14) defective caulking in a

24    bathroom; (15) incomplete construction of a cabinet and

25    counter in a kitchen; (16) a defective shower enclosure;

26    (17) missing and cracked kitchen tiles; (18) ripped

27    carpeting in a living room; (19) defective drywall and

28    plaster surrounding a bathroom sink; and (20) a cracked and

1    peeling bathtub.

2

3        In November, 2008, Mr. Jaramillo inspected the building

4    and took photographs.  These photographs formed the basis of

5    counts 1 through 11 and were admitted into evidence.  They

6    depicted the following fire code violations: (1) a missing

7    handle on a water spigot used for fire suppression in an

8    emergency; (2) absence of exit signs over ten fire doors;

9    (3) two defective smoke detectors; (4) three fire doors

10   improperly propped open; (5) two dysfunctional magnetic

11   devices used to hold doors open; (6) four fire doors that

12   did not "self-close and latch"; (7) a defective piping

13   system that adversely impacted the water supply used to

14   fight fires; and (8) the absence of directional exit signs

15   in the basement.

16

17       Mr. Jaramillo also determined [Petitioner] did not have

18   required records indicating the smoke detectors and the fire

19   alarm had been tested.

20

21   (Respondent's Lodgment 7, pp. 2-3).

22

23                      **STANDARD OF REVIEW**

24

25       Under the "Antiterrorism and Effective Death Penalty Act of 1996"

26   ("AEDPA"), a federal court may not grant an application for writ of

27   habeas corpus on behalf of a person in state custody with respect to

28   any claim that was adjudicated on the merits in state court

1   proceedings unless the adjudication of the claim: (1) "resulted in a

2   decision that was contrary to, or involved an unreasonable application

3   of, clearly established Federal law, as determined by the Supreme

4   Court of the United States"; or (2) "resulted in a decision that was

5   based on an unreasonable determination of the facts in light of the

6   evidence presented in the State court proceeding."  28 U.S.C. §

7   2254(d); Woodford v. Visciotti, 537 U.S. 19, 24-26 (2002); Early v.

8   Packer, 537 U.S. 3, 8 (2002); Williams v. Taylor, 529 U.S. 362, 405-09

9   (2000).  This standard of review is "highly deferential" and

10  "difficult to meet."  Harrington v. Richter, 131 S. Ct. 770, 786

11  (2011); Woodford v. Visciotti, 537 U.S. at 24.  "The petitioner

12  carries the burden of proof."  Cullen v. Pinholster, 131 S. Ct. 1388,

13  1398 (2011).

14

15       "Clearly established Federal law" refers to the governing legal

16  principle or principles set forth by the Supreme Court at the time the

17  state court renders its decision.  Lockyer v. Andrade, 538 U.S. 63

18  (2003).  A state court's decision is "contrary to" clearly established

19  Federal law if: (1) it applies a rule that contradicts governing

20  Supreme Court law; or (2) it "confronts a set of facts. . . materially

21  indistinguishable" from a decision of the Supreme Court but reaches a

22  different result.  See Early v. Packer, 537 U.S. at 8 (citation

23  omitted); Williams v. Taylor, 529 U.S. at 405-06.

24

25       Under the "unreasonable application prong" of section 2254(d)(1),

26  a federal court may grant habeas relief "based on the application of a

27  governing legal principle to a set of facts different from those of

28  the case in which the principle was announced."  Lockyer v. Andrade,

1  538 U.S. at 76 (citation omitted); see also Woodford v. Visciotti, 537
2  U.S. at 24-26 (state court decision "involves an unreasonable
3  application" of clearly established federal law if it identifies the
4  correct governing Supreme Court law but unreasonably applies the law
5  to the facts). A state court's decision "involves an unreasonable
6  application of [Supreme Court] precedent if the state court either
7  unreasonably extends a legal principle from [Supreme Court] precedent
8  to a new context where it should not apply, or unreasonably refuses to
9  extend that principle to a new context where it should apply."
10  Williams v. Taylor, 529 U.S. at 407 (citation omitted).

11

12       "In order for a federal court to find a state court's application
13  of [Supreme Court] precedent 'unreasonable,' the state court's
14  decision must have been more than incorrect or erroneous." Wiggins v.
15  Smith, 539 U.S. 510, 520 (2003) (citation omitted). "The state
16  court's application must have been 'objectively unreasonable.'" Id.
17  at 520-21 (citation omitted); see also Waddington v. Sarausad, 555
18  U.S. 179, 190 (2009); Davis v. Woodford, 384 F.3d 628, 637-38 (9th
19  Cir. 2004), cert. dism'd, 545 U.S. 1165 (2005).

20

21       In applying these standards, the Court looks to the last reasoned
22  state court decision. See DeWeaver v. Runnels, 556 F.3d 995, 997 (9th
23  Cir.), cert. denied, 130 S. Ct. 183 (2009). Where there exists only a
24  summary denial, "a habeas court must determine what arguments or
25  theories supported, . . . or could have supported, the state court's
26  decision; and then it must ask whether it is possible fairminded
27  jurists could disagree that those arguments or theories are
28  inconsistent with the holding in a prior decision of this Court."

1 | <u>Harrington v. Richter</u>, 131 S. Ct. at 786; <u>see also</u> <u>Cullen v.</u>
2 | <u>Pinholster</u>, 131 S. Ct. at 1403 (quoting same).  This is "the only
3 | question that matters under § 2254(d)(1)."  <u>Harrington v. Richter</u>, 131
4 | S. Ct. at 786 (citation and internal quotations omitted).  Habeas
5 | relief may not issue unless "there is no possibility fairminded
6 | jurists could disagree that the state court's decision conflicts with
7 | [the United States Supreme Court's] precedents."  <u>Id.</u> at 786-87 ("As a
8 | condition for obtaining habeas corpus from a federal court, a state
9 | prisoner must show that the state court's ruling on the claim being
10 | presented in federal court was so lacking in justification that there
11 | was an error well understood and comprehended in existing law beyond
12 | any possibility for fairminded disagreement.").
13 |
14 | **DISCUSSION**
15 |
16 | I.    <u>**Petitioner's Claim that the Trial Court Denied Her**</u>
17 |       <u>**the Right to Put on a Defense Does Not Merit Habeas Relief.**</u>
18 |
19 |       Petitioner claims that the trial court denied her the right to
20 | put on a defense by ruling that the charged offenses were "strict
21 | liability" offenses under California law (Petition, Ground One; Reply,
22 | p. 1).  Specifically, Petitioner argues that the trial court prevented
23 | her from attempting to prove that her tenants had caused the subject
24 | conditions at the property, either by destroying the property or by
25 | destroying Petitioner's repairs to the property (Reply, p. 1; <u>see also</u>
26 | Respondent's Lodgment 4, p. 12, and Respondent's Lodgment 6, p. 1,
27 | Respondent's Lodgment 11, p. 5).  As discussed below, Petitioner's
28 | argument does not merit habeas relief.

1      **A.**    **The Trial Court's Rulings**

2

3      Prior to the start of trial, the prosecution filed motions in

4  limine seeking rulings establishing that: (1) some or all of the

5  counts pleaded were strict liability offenses; and (2) the defense may

6  not assert a legal impossibility defense and therefore the court must

7  exclude all references to Petitioner's alleged inability to bring the

8  property in compliance. See Respondent's Lodgment 3a, pp. 7-24

9  (motions in limine citing, inter alia, People v. Bachrach, 114 Cal.

10  App. 3d Supp. 8, 170 Cal. Rptr. 773 (Cal. App. Super. 1980)

11  ("Bachrach").[4]

12

---

13      [4]   In Bachrach, a defendant landlord had been convicted of
Los Angeles Municipal Code public safety and fire prevention
14  violations for failure to provide exit signs, failure to secure a
vacant building, failure to provide a garbage bin with heat
15  activated closing devices, maintaining an antenna less than seven
feet high on an accessible roof, failure to maintain a fire door,
16  failure to correct hazardous conditions after notice, and failure
to have a wet standpipe system tested within a five-year period.
17  Bachrach, 114 Cal. App. 3d Supp. at 12 n.2, 170 Cal. Rptr. at 775
n.2. In affirming the conviction, the Los Angeles County
18  Superior Court Appellate Department found that the violations
were strict liability offenses, designed to protect the safety of
19  tenants. The Bachrach court explained:
20

21      The [trial] court correctly instructed the jury that
intent was not an element of any of the offenses with
22      which the defendant was charged. These offenses being,
as they are, against the public health and safety and
23      against the public welfare, do not require proof of
intent nor criminal negligence, but are governed by
24      rules of "strict liability." The rationale given for
imposing strict liability to the proscribed acts
25      include the following: Statutes of this nature are
primarily concerned with the protection of the public
26      and not with the punishment and correction of
offenders.
27

28

                                        (continued...)

1    Petitioner opposed the motion, arguing that strict liability

2   should not apply to violations like those at issue and that she should

3   be permitted to introduce evidence that the tenants allegedly

4   interfered with her asserted attempts to remedy the code violations.

5   See Respondent's Lodgment 3b (Plaintiff's opposition).   Petitioner

6   also filed proposed jury instructions essentially adding to the

7   charged offenses a proposed element that the defendant had the "power"

8   to prevent or to remedy the code violations.   See Respondent's

9   Lodgment 3c.

10

11    After hearing extensive argument (R.T. 14-52), the trial court

12   reaffirmed its tentative ruling that strict liability would apply to

13   the charged crimes as public welfare offenses under Bachrach.   See

14   R.T. 57; see also R.T. 18-19 (tentative ruling).   The trial court

15

16    ⁴(...continued)

17                              *   *   *

18   Whether a legislative body intended the doctrine of
     strict liability to apply to a given statute is
19   determined by the subject matter, the language, the
     evil sought to be prevented by the enactment of the
20   statute.   From the subject matter, the language, and
     the purpose of the laws which the jury found the
21   defendant violated, the legislative intent in their
     enactment is clear.   These laws were adopted to protect
22   the lives and property of persons in crowded
     apartments.   While these laws impose obligations upon
23   apartment house owners such as the defendant "[he]. . .
     is in a position to prevent [the violations] with no
24   more care than society might reasonably expect and no
     more exertion than it might reasonably exact from one
25   who assumed his responsibilities."

26

27   Bachrach, 114 Cal. App. 3d Supp. at 12-13; 170 Cal. Rptr. at 775-
     76 (internal footnote and citations omitted; quoting Morissette
28   v. United States, 342 U.S. 246, 256 (1952)).

1  noted that, in order for Petitioner to present an impossibility

2  defense, Petitioner would have to have "substantial evidence" that

3  repairs were objectively impossible (R.T. 17).  The court explained:

4

5      It's not simply that you have the landlord, for example,

6      testifying that on such and such a date she tried to fix the

7      screen.  That's not substantial evidence, in my view.  ¶  To

8      get to the objective impossibility, you would have to show

9      much more.  How much more I don't know, because I don't know

10     where that line is, but it's substantial evidence that it

11     was objectively impossible for [Petitioner] to comply with

12     the law.  Not difficult.  Not very difficult.  Objectively

13     impossible.

14

15  (R.T. 17).  The trial court deferred ruling on whether the defense of

16  impossibility would be allowed, giving the defense an opportunity to

17  make a record outside the presence of the jury regarding the evidence

18  of impossibility the defense proposed to present (R.T. 44-45, 56-57).

19

20     Once the trial had begun, and before any witnesses were called to

21  testify, the defense proffered its evidence related to the

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1  impossibility defense (R.T. 127).[5]  Outside the presence of the jury,

2  the trial court ruled:

3

4        [5]    Although the actual proffer is not a part of the
5  record, it appears that at least portions of the proffer are
   attached as Exhibit B to Respondent's Lodgment 3b.   The trial
6  court summarized the defense proffer as follows:

7            Some handwritten notes dated November 30th, 2008,
8       of someone who apparently was – and I'm just assuming
        it – came to the apartment house at 207 Oxford, took
9       photographs, noticed various things such as a screen
        removed, a stay out sign on a particular unit, 406.
10      Various observed situations, most of them or many of
        them are screen removal, door locks being removed.
11
             And then a declaration from an on-site manager,
12      Christine DePauw, dated October 10 summarizing that
        they were not receiving cooperation from tenants as far
13      as maintenance issues were concerned about a scheduled
        pest control service, that the tenants demanding that
14      the extermination service be terminated.  That was on
        October 9th.  And it doesn't appear that there's any
15      other date or incident that is referred to in the
        declaration, but that's on a quick reading.
16
             A declaration of Joshua Harvey and Adam Brubaker,
17      who were general contractors who went one day,
        November 7, to apartment number four telling the tenant
18      that they wanted to make repairs.  She would not allow
        any maintenance personnel inside and telling them that
19      – that is, Mr. Harvey and Mr. Brubaker – that she was –
        the lawyer told her not to let the repair people in,
20      and that she would only wait – she would only allow the
        City to come in and fix her apartment.
21
             And I'm summarizing, obviously, the declaration of
22      Mr. Harvey and Mr. Luis going on a second day,
        November 10th, 2008, to an apartment because they were
23      informed that the gas was not working.  And they tried
        to coordinate with the gas company.  There was some
24      allegation that there was potential tampering and the
        effect it had on the hot water and the fact that they
25      reset the automatic pilot light.

26  (R.T. 129-30).

27

28

1       As I think I indicated to all sides very early on, Ms.

2      Hujazi is going to have a right to put on a defense, if she

3      chooses.  She will have the right to confront the witnesses

4      that the People call.  The only issue is whether or not she

5      has the right to show that another committed the violation.

6

7       I've already ruled that, under the <u>Bachrach</u> case, it's

8      this court's view that such evidence is irrelevant. . . .

9      But at least based upon what I have read, I don't see how,

10     under any circumstances, the proffered evidence. . . would

11     rise to legal impossibility. . .

12

13  (R.T. 128).  The trial court noted that Petitioner provided no

14  evidence that she took any action to remove the tenants or to bring

15  suit against the tenants as part of her efforts to bring the property

16  in compliance (R.T. 130; <u>see also</u> R.T. 173 (court explaining, "[A]ll

17  . . . the proffer seems to indicate is that there were some

18  uncooperative tenants in the period from October 27th to November 1st

19  and then also on November 30th, but that there was absolutely no

20  indication of what the defendant did either in the way of trying to

21  evict uncooperative tenants or bring money damage suits.  And I'm not

22  saying that even had she done . . . that, that it would constitute

23  substantial evidence of impossibility, but there isn't any."); R.T.

24  178-79 (trial court again explaining the deficiency in the defense

25  proffer)).

26

27    At the close of trial, the trial court denied Petitioner's

28  proposed jury instructions in light of its earlier rulings on strict

1  liability and the defense of impossibility.   See R.T. 298.

2

3     **B.     State Court Post-Conviction Proceedings**

4

5        On direct appeal, Petitioner challenged the trial court's

6  determination that the offenses were strict liability offenses.   See

7  Respondent's Lodgment 4, pp. 1-12; Respondent's Lodgment 6, pp. 1-3.

8  The Los Angeles County Superior Court Appellate Division rejected the

9  appeal, finding that the trial court committed no error in concluding

10  that the offenses were strict liability offenses under California law

11  (Respondent's Lodgment 7, pp. 3-5).

12

13        In a collateral petition to the California Supreme Court,

14  Petitioner argued, inter alia, "Petitioner was prohibited from putting

15  on a defense."   (Docket Entry 33 filed in Action No. CV 11-1555-

16  ODW(E)).   The California Supreme Court summarily denied this petition

17  (Docket Entry 3 in present action).

18

19     **C.     Analysis**

20

21        As previously stated, this Court may grant the Petition only if

22  the state court adjudication (1) resulted in a decision that was

23  "contrary to," or involved an "unreasonable application of, clearly

24  established federal law as determined by the Supreme Court"; or

25  (2) resulted in a decision that was based on an unreasonable

26  determination of the facts in light of the evidence presented to the

27  state court.   See 28 U.S.C. § 2254(d); see also Harrington v. Richter,

28  131 S. Ct. 770, 786 (2011).   Thus, to the extent Petitioner may be

1  claiming that the trial court rulings violated California law,

2  Petitioner is not entitled to habeas relief.   See Wilson v. Corcoran,

3  131 S. Ct. 13, 16 (2010) ("it is only noncompliance with *federal* law

4  that renders a State's criminal judgment susceptible to collateral

5  attack in the federal courts") (original emphasis); Estelle v.

6  McGuire, 502 U.S. 62, 67-68 (1991) (mere errors in the application of

7  state law are not cognizable on federal habeas review).   The Appellate

8  Division held that the trial court did not err in determining that the

9  charged crimes were strict liability crimes and in instructing the

10  jury accordingly (Respondent's Lodgment 7, pp. 4-11).   It is not for

11  this Court to reexamine the state court's determination on this state

12  law issue.   See Waddington v. Sarausad, 555 U.S. 179, 192 n.5 (2009)

13  ("we have repeatedly held that it is not the province of a federal

14  habeas court to reexamine state-court determinations on state-law

15  questions") (citation and internal quotations omitted); Bradshaw v.

16  Richey, 546 U.S. 74, 76 (2005) ("a state court's interpretation of

17  state law, including one announced on direct appeal of the challenged

18  conviction, binds a federal court sitting in habeas corpus"); see also

19  Holgerson v. Knowles, 309 F.3d 1200, 1202 (9th Cir. 2002), cert.

20  denied, 538 U.S. 1005 (2003) (federal habeas court "bound by

21  California's interpretation of its state law") (citation omitted);

22  Garrison v. Trombley, 2009 WL 311102, at *9 (E.D. Mich. Feb. 9, 2009)

23  (federal habeas court bound by state court's interpretation of state

24  law as imposing "strict criminal liability").

25

26      To the extent Petitioner may claim that the trial court's rulings

27  violated federal law, Petitioner also is not entitled to habeas

28  relief.   Petitioner has cited no clearly established United States

1 Supreme Court decisional law, and this Court has found none,

2 determining the per se unconstitutionality of strict liability

3 offenses or the unconstitutionality of strict liability offenses like

4 the ones here involved.   To the contrary, in Morissette v. United

5 States, 342 U.S. 246, 255 (1952) ("Morissette"), the Supreme Court

6 recognized that strict liability often is imposed for "public welfare

7 offenses," i.e., offenses that are "in nature of neglect where the law

8 requires care, or inaction where it imposes a duty."   Id.   As the

9 Ninth Circuit has explained:

10

11        The [Morissette] Court developed the exception for public

12        welfare offense from the statutory presumption of mens rea

13        because of hazards arising out of the Industrial Revolution,

14        which created "dangers [that] have engendered increasingly

15        numerous and detailed regulations which heighten the duties

16        of those in control of particular industries, trades,

17        properties or activities that affect public health, safety

18        or welfare."

19

20 Humanitarian Law Project v. U.S. Dept. of Justice, 352 F.3d 382, 402

21 n.14 (9th Cir. 2003), vacated on other grounds by, 393 F.3d 902 (9th

22 Cir. 2004) (quoting Morissette, 342 U.S. at 254; emphasis added).

23

24    The fact that lawmakers have "sought to make such regulations

25 more effective by invoking criminal sanctions to be applied by the

26 familiar technique of criminal prosecutions and convictions" has not

27 rendered these regulations unconstitutional.   Morissette, 342 U.S. at

28 254-60 (discussing with approval state regulatory cases that have

17

1  abandoned the "ingredient of intent," but conceding that no precise

2  criteria have been set forth for distinguishing between crimes that

3  require a "mental element" and crimes that do not); Staples v. United

4  States, 511 U.S. 600, 607 n.3 (1994) ("[W]e have referred to public

5  welfare offenses as 'dispensing with' or 'eliminating' a mens rea

6  requirement or 'mental element' and have described them as strict

7  liability crimes.  While use of the term 'strict liability' is really

8  a misnomer, we have interpreted statutes defining public welfare

9  offenses to eliminate the requirement of mens rea; that is, the

10  requirement of a 'guilty mind' with respect to an element of the

11  crime.  Under such statutes we have not required that the defendant

12  know the facts that make his conduct fit the definition of the

13  offense.") (citing, inter alia, Morissette, 342 U.S. at 250, 263); see

14  also United States v. Dotterweich, 320 U.S. 277, 280-81 (1943) (such

15  legislation acts "in the interest of the larger good [by putting] the

16  burden of acting at hazard upon a person otherwise innocent but

17  standing in responsible relation to a public danger"); United States

18  v. Hanousek, 176 F.3d 1116, 1121 (9th Cir. 1999), cert. denied, 528

19  U.S. 1102 (2000) ("It is well established that a public welfare

20  statute may subject a person to criminal liability for his or her

21  ordinary negligence without violating due process.") (citations

22  omitted); People v. Vurckio, 162 Misc. 2d 876, 880, 619 N.Y.S. 2d 510,

23  512 (N.Y. City Crim. Ct. 1994) ("Since the turn of the [20th] century,

24  state courts have discontinued inquiry into 'intent' in a limited

25  ///

26  ///

27  ///

28  ///

1  class of offenses, such as labor law and building code violations.").[6]

2

3       There is no clearly established Supreme Court law defining the

4  precise criteria courts should employ in determining which crimes

5  constitutionally require a mental element and which crimes do not.

6  See Morissette, 342 U.S. at 260; see also Powell v. State of Texas,

7  392 U.S. 514, 535 (1968) ("this Court has never articulated a general

8  constitutional doctrine of mens rea").  Because of this lack of

9  clarity, and the case law permitting strict liability under similar

10 public welfare regulations, the state courts were not unreasonable in

11 _____

12      [6]    Petitioner argues that the Supreme Court has "severely
    narrowed" Morissette, citing Smith v. California, 361 U.S. 147
13  (1959) ("Smith") and Carella v. California, 491 U.S. 263 (1989)
    ("Carella") (Petition, Ground One; Reply, p. 3).  Petitioner's
14  argument is unpersuasive.  In Smith, the Supreme Court struck
    down as unconstitutional a Los Angeles Municipal Code provision
15  imposing strict liability on a bookseller possessing obscene
    material, finding that the ordinance's failure to require any
16  knowledge on the part of the bookseller would impose a "severe
    limitation" on the public's access to constitutionally-protected
17  expression.  Smith, 361 U.S. at 153-55.  Smith did not undermine
    the rationale of Morissette that strict liability is permissible
18  for public welfare offenses that concern public health, safety or
    welfare without implicating freedom of expression.  See Smith,
19  361 U.S. at 153 (contrasting the unconstitutional booksellers
    ordinance with food and drug legislation which involves a public
20  interest "so great" as to "warrant the imposition of the highest
    standard of care on distributors").
21
22      The Carella decision is even more inapposite than Smith.  In
    Carella, the Supreme Court found unconstitutional "mandatory"
23  jury instructions that "directly foreclosed independent jury
    consideration of whether the facts proved established certain
24  elements of the [charged] offenses."  Carella, 491 U.S. at 266.
    The instructions provided that intent to commit theft by fraud is
25  presumed in certain circumstances, when such intent was a
    specific element of the charged crime.  Id. at 264.  Here, unlike
26  in Carella, the trial court found that intent was not an element
    of the charged offenses.  Carella does not invalidate strict
27  liability offenses or otherwise undermine Morissette.
28

1  rejecting Petitioner's constitutional claims.[7]  Thus, habeas relief is

2

3      [7]     Buttressing this conclusion are Supreme Court
pronouncements underscoring the importance to the public welfare
4  of code provisions such as those involved in the present case.
In Morissette, the Supreme Court noted that "[c]ongestion in
5  cities and crowding of quarters called for health and welfare
regulations undreamed of in simpler times." Morissette, 342 U.S.
6  at 254.  In Frank v. State of Md., 359 U.S. 360, 371-72 (1959)
(overruled on other grounds by Camara v. Municipal Court of City
7  and County of San Francisco, 387 U.S. 523 (1967)), which upheld
warrantless inspections of dwellings for enforcement of city
8  health codes, the Supreme Court stated:

9

10         The need to maintain basic, minimal standards of
          housing, to prevent the spread of disease and of that
11         pervasive breakdown in the fiber of a people which is
          produced by slums and the absence of the barest
12         essentials of civilized living, has mounted to a major
          concern of American government.  The growth of cities,
13         the crowding of populations, the increased awareness of
          the responsibility of the state for the living
14         conditions of its citizens, all have combined to create
          problems of the enforcement of minimum standards. . . .
15         Time and experience have forcefully taught that the
          power to inspect dwelling places. . . is of
16         indispensable importance to the maintenance of
          community health. . . .
17

18         Petitioner's citations of United States v. Park, 421 U.S.
   658 (1975) ("Park") and Staples v. United States, 511 U.S. 600
19  (1994) do not alter the Court's conclusion.  Petitioner suggests
   that these cases clearly establish that whether a crime requires
20  a mental element depends on whether the harm sought to be
   prevented is imminent or inherent (in which case no mental
21  element would apply), or merely a possibility (in which case a
   mental element would apply).  See Reply, pp. 4-5.  The cited
22  cases establish no such principle.  The Park case, discussed
   further infra, concerned whether the manager of a corporation and
23  the corporation itself could be held strictly liable for Federal
   Food, Drug and Cosmetic Act violations.  The Park Court stated
24  that the regulations at issue dispensed with the conventional
   requirement for awareness of some wrongdoing because the
25  regulations "touch phases of the lives and health of people
   which, in the circumstances of modern industrialism, are largely
26  beyond self-protection." See Park, 421 U.S. at 668 (quoting
   United States v. Dotterweich, 320 U.S. at 280).  The Park Court
27                                                          (continued...)
28

1  unavailable.  See 28 U.S.C. § 2254(d); Feliciano v. McNeil, 2009 WL

2  1971635, at *15 (N.D. Fla. July 6, 2009) ("Given the lack of clearly

3  established Supreme Court precedent on the criteria for determining

4  when criminal intent is required and when it is not, this court cannot

5  say that the state court's denial of relief on this claim is contrary

6  to clearly established federal law"; habeas relief denied to

7  petitioner who had been convicted of statutory rape without fault and

8  sentenced to more than seven years in prison); see also Tart v.

9  Commonwealth of Massachusetts, 949 F.2d 490, 503 (1st Cir. 1991)

10  (rejecting constitutional challenge to criminal statute imposing

11  strict liability for landing raw fish without a commercial fishing

12  permit).

13

14      Petitioner's assertion that trial court rulings deprived her of

15  the right to present a defense is similarly unavailing.  "Whether

16  rooted directly in the Due Process Clause of the Fourteenth Amendment,

17  or in the Compulsory Process or Confrontation clauses of the Sixth

18  Amendment, the Constitution guarantees criminal defendants a

19  meaningful opportunity to present a complete defense."  Holmes v.

20  South Carolina, 547 U.S. 319, 324 (2006) (citations and internal

21  _____

22      [7](...continued)
   said nothing about imminence or inherence of harm being a
23  touchstone with respect to the absence or presence of a mental
   element requirement.  In Staples v. United States, the Supreme
24  Court expressly declined to establish any rule regarding when
   crimes may or must require a mental element.  See Staples v.
25  United States, 511 U.S. at 619-20 ("As we noted in Morissette:
   'Neither this Court nor, so far as we are aware, any other has
26  undertaken to delineate a precise line or set forth comprehensive
   criteria for distinguishing between crimes that require a mental
27  element and crimes that do not.'  We attempt no definition here,
   either.") (internal citation omitted).
28

1  quotations omitted); <u>Chambers v. Mississippi</u>, 410 U.S. 284, 302 (1973)

2  ("<u>Chambers</u>"); <u>Chia v. Cambra</u>, 360 F.3d 997, 1003 (9th Cir. 2004),

3  <u>cert. denied</u>, 544 U.S. 919 (2005) ("The Supreme Court has made it

4  clear that the erroneous exclusion of critical, corroborative defense

5  evidence may violate both the Fifth Amendment due process right to a

6  fair trial and the Sixth Amendment right to present a defense.")

7  (citations and internal quotations omitted).  However, "<u>Chambers</u> . . .

8  does not stand for the proposition that the defendant is denied a fair

9  opportunity to defend himself whenever a state . . . rule excludes

10  favorable evidence."  <u>United States v. Sheffer</u>, 523 U.S. 303, 316

11  (1998).

12

13       "While the Constitution . . . prohibits the exclusion of defense

14  evidence under rules that serve no legitimate purpose or that are

15  disproportionate to the ends that they are asserted to promote, well-

16  established rules of evidence permit trial judges to exclude evidence

17  if its probative value is outweighed by certain other factors such as

18  unfair prejudice, confusion of the issues, or potential to mislead the

19  jury." <u>Holmes v. South Carolina</u>, 547 U.S. at 320 (citations omitted);"

20  <u>see also</u> <u>Moses v. Payne</u>, 555 F.3d 742, 758 (9th Cir. 2009).  Thus,

21  "the Constitution permits judges to exclude evidence that is

22  repetitive . . . , only marginally relevant or poses an undue risk of

23  harassment, prejudice or confusion of the issues." <u>Holmes v. South</u>

24  <u>Carolina</u>, 547 U.S. at 326-27 (citations, internal brackets and

25  quotations omitted).

26

27       Petitioner relied on dictum in <u>Park</u>, 421 U.S. at 676-77, to argue

28  that her alleged impossibility evidence was relevant to a viable

22

1  defense.  See R.T. 14; Respondent's Lodgment 3b, p. 5.  In Park, the

2  Supreme Court held that the Federal Food, Drug and Cosmetic Act, 21

3  U.S.C. § 301(k), imposed on corporate agents not only the duty to seek

4  out and remedy violations, but also the duty to implement measures to

5  ensure that violations will not occur.  Park, 421 U.S. at 673-74.  The

6  Court observed that a requested instruction on "objective

7  impossibility" or lack of "power or capacity" should be given if a

8  defendant first presents sufficient evidence to put such a defense at

9  issue.  See United States v. Y. Hata & Company, Ltd., 535 F.2d 508,

10  510-11 (9th Cir. 1976), cert. denied, 429 U.S. 828 (1976) ("Hata")

11  (discussing same).

12

13       While Park suggests that responsible corporate agents may raise a

14  defense of powerlessness to prevent or correct a violation, (citing

15  United States v. Weisenfeld Warehouse Co., 376 U.S. 86, 91 (1964)),

16  Park makes clear that there must be sufficient supporting evidence to

17  do so.  Park, 421 U.S. at 673, 677.  What is required is more than

18  merely a showing that the responsible party did not cause a violation

19  or that some efforts to remedy a violation were frustrated.  See

20  United States v. Starr, 535 F.2d 512, 515 (9th Cir. 1976) (allegations

21  that food violations were due to "natural phenomenon" of vermin

22  fleeing a nearby plowed field to contaminate a warehouse, and

23  subsequent sabotage of corrective efforts by a third party, did not

24  negate the warehouser's duty of "foresight and diligence" to support

25  an objective impossibility defense); Hata, 535 F.2d at 511 (assuming,

26  arguendo, that Park impossibility defense is available to an

27  individual, allegations that repair attempts were unsuccessful would

28  not support impossibility defense).

1    In the present case, regardless of whether the tenants originally

2  caused the violations or frustrated some of Petitioner's alleged

3  efforts to remedy the violations, Petitioner's offer of proof fell far

4  short of a sufficient showing that it had been impossible for

5  Petitioner to correct the violations.   Petitioner stipulated that she

6  was the owner, manager or person in control of the property (R.T.

7  316).   In this capacity, Petitioner was responsible for maintenance of

8  the properties and for remedying the identified violations.   "The

9  accused, if [s]he does not will the violation, usually is in a

10  position to prevent it with no more care than society might reasonably

11  expect and no more exertion than it might reasonably exact from one

12  who assumed [her] responsibilities."   Morissette, 342 U.S. at 256.

13  While Petitioner may have claimed that she was "powerless" to prevent

14  or correct the violations, the trial court reasonably concluded that

15  Petitioner's offer of proof was inadequate to support such a claim.

16  This Court agrees that Petitioner's offer of proof fell far short of

17  the required showing of objective impossibility.[8]   For the same

18

---

19    [8]    In her Reply, Petitioner argues for the first time that
20  the prosecution violated Brady v. Maryland, 373 U.S. 83 (1963)
    ("Brady") by allegedly suppressing evidence that Petitioner
21  purportedly had been targeted by a law firm specializing in
    tenant rights (Reply, pp. 1-2).   Under Brady, the suppression by
22  the prosecution of evidence favorable to an accused violates due
    process "where the evidence is material either to guilt or to
23  punishment. . . ."   Id. at 87.   Suppressed evidence is material
    under Brady if there is a reasonable probability that, had the
24  evidence been disclosed to the defense, the result of the
    proceeding would have been different.   Kyles v. Whitley, 514 U.S.
25  419, 433 (1995).

26    Given the strict liability nature of the subject offenses,
27  as discussed above, there plainly exists no reasonable
    probability that introduction of the allegedly suppressed
28                                                            (continued...)

24

1  reason, the exclusion of Petitioner's scant proffered evidence

2  relevant to a purported objective impossibility defense had no

3  "substantial and injurious effect or influence in determining the

4  jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993)

5  (federal habeas relief unavailable for trial-type errors that are not

6  of "substantial and injurious effect"); see Fry v. Pliler, 551 U.S.

7  112 (2007) (Brecht standard applies to federal habeas review of

8  Chambers errors).

9

10                          **RECOMMENDATION**

11

12       For the all of the foregoing reasons, IT IS RECOMMENDED that the

13  Court issue an Order: (1) accepting and adopting this Report and

14  Recommendation; and (2) denying and dismissing the Petition with

15  prejudice.

16

17       DATED: June 6, 2012.

18

19                           _____/S/_____

20                           CHARLES F. EICK
                             UNITED STATES MAGISTRATE JUDGE

21

22       _____

            [8](...continued)
23  evidence would have altered the result of Petitioner's trial.
    Whether the defense theory should be characterized as
24  "impossibility," "obstruction," or something else, the result of
    the trial doubtlessly would have remained the same even if the
25  alleged suppression of evidence had not taken place.  The obvious
    lack of merit of Petitioner's belated Brady claim obviates any
26  need to analyze whether the claim is exhausted or unexhausted.
    See Cassett v. Stewart, 406 F.3d 614, 623-24 (9th Cir. 2005),
27  cert. denied, 546 U.S. 1172 (2006) (habeas court may deny on the
    merits unexhausted claim that is not "colorable").
28

1  **NOTICE**

2      Reports and Recommendations are not appealable to the Court of
3  Appeals, but may be subject to the right of any party to file
4  objections as provided in the Local Rules Governing the Duties of
5  Magistrate Judges and review by the District Judge whose initials
6  appear in the docket number.  No notice of appeal pursuant to the
7  Federal Rules of Appellate Procedure should be filed until entry of
8  the judgment of the District Court.

9      If the District Judge enters judgment adverse to Petitioner, the
10 District Judge will, at the same time, issue or deny a certificate of
11 appealability.  Within twenty (20) days of the filing of this Report
12 and Recommendation, the parties may file written arguments regarding
13 whether a certificate of appealability should issue.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28